LAURA S. McCALL, as Executrix &c. of James McCall, Respondent, *against* SCHAMU M. MOSCHOWITZ *et al.*, Appellants.

(Decided June 7th, 1886.)

During the trial of a suit for dissolution of a co-partnership, in which the existence of the partnership was in issue, the court, finding that an examination of a long account was involved, of its own motion, and against defendants' objections, ordered a reference. After hearing before the referee without objection as to his right to proceed, an interlocutory judgment was entered upon his report in favor of plaintiff. Upon appeal from such judgment, defendants contended that the judgment should be set aside because, the main issue being whether a partnership in fact existed, the cause was not referrible. *Held*, that such objection would not avail, because the appeal was brought two years after the order of reference was made, the time to appeal from such an order being limited to thirty days (Code Civ. Pro. § 1351); and the appeal, being from an interlocutory judgment, did not bring up for review an intermediate order; nor was the order of reference

McCall *v.* Moschowitz.

an order "necessarily affecting the final judgment," within the provision for review of intermediate orders on appeal from final judgments (Code Civ. Pro. § 1316).

In an action for dissolution of a co-partnership, the existence of the alleged partnership was denied by defendants. *Held*, that letters written by plaintiff to a third party before the alleged partnership were admissible in evidence, if limited to the purpose of showing the relations existing between the parties, forming part of the inducement to the partnership; and that letters written by plaintiff to defendants during the alleged partnership, in its current business, to the contents of which defendants did not at the time object, were admissible as tending to show the purposes and intentions of the parties.

Testimony of bookkeepers, after examination of books of an alleged partnership, that they contain no entry indicating that a certain person was a partner, is not admissible, the books themselves being the best evidence.

A party to an action cannot at the trial compel the inspection of private writings of a witness not a party, without the declared intention of offering them in good faith in evidence.

In an action for dissolution of a co-partnership, defendants, in their answer and at the trial, contended that no partnership ever existed between them or either of them and plaintiff; and that his relation to them was that of money lender. *Held*, that they could not give evidence of a prior partnership between plaintiff and one of defendants, and a loss resulting therefrom.

In such action, plaintiff claimed on the accounting the amount of a claim of one T. against the firm, which plaintiff had personally guaranteed. *Held*, that defendants were entitled to show payments made by them to T., and also a defense of usury against T.'s claim; and that T. had commenced an action against them on such claim.

At the trial, before a referee, of an action in which the complaint averred and the answer denied a co-partnership between the parties, the evidence on that issue was exceedingly contradictory, even plaintiff's own testimony containing apparent contradictions, which, however, were capable of being reconciled. The referee found that the alleged partnership existed. *Held*, on appeal from an interlocutory judgment on his report, the case bringing up all the evidence for review, that his finding, being abundantly supported by evidence, should be sustained, notwithstanding the burden of proof was on plaintiff, and although a finding to the contrary would not have been disturbed.

In an action for the dissolution of a partnership and the appointment of a receiver, etc., in which the partnership was denied, the referee to whom it was referred, after finding the fact of partnership, and before ascertaining the liabilities of the firm, and whether it was solvent or not, and without any inquiry into the advances made by defendants, or the stock or capital contributed by them, or their claims against the partnership, found the amount of advances made by plaintiff, and gave judgment for that amount without any provision for general cred-

McCall v. Moschowitz.

itors of the firm, and without ascertaining the value of its assets. *Held*, error; that the referee should have found, first, whether a partnership existed; second, how the firm stood as to its general creditors, taking into account all defenses against alleged creditors' claims; third, what each partner was entitled to charge against the others for everything he had advanced or brought into the co-partnership, and what was to be charged against him for what he had taken out, in excess of what he ought; fifth, the profits to be divided or losses to be borne between the partners, and what, if anything, any one partner should pay to another in order that their cross-claims should be finally settled.

Where the good will of a business depends almost exclusively upon the knowledge and skill of one of the partners, it is not a partnership asset, and is not subject to sale to pay partnership debts.

APPEAL from an interlocutory judgment of this court entered on the report of a referee.

The action was brought to dissolve a co-partnership alleged to have been entered into between the plaintiff's testator, James McCall, and the defendants.

The business was that of dressmaking, in which the defendant Schamu M. Moschowitz is an expert.

The action came on for trial at the Equity Term of this court, in April, 1882; and after three days had been occupied in such trial, the court, of its own motion, ordered a reference therein; and the referee who tried the case was agreed to by the parties, although the defendants objected to the order of reference.

The referee rendered his report in October, 1884, in which he found as matters of fact:

1. That James McCall and the defendants, on the first of January, 1881, entered into a co-partnership under the name of Moschowitz Brothers, to continue from that date until the first of January, 1882, to carry on the dressmaking business, including the purchase and sale of materials made and unmade. That McCall was to take charge of the financial affairs of the co-partnership, and procure money, as far as it might be required and he was able to do, to carry on the business. That defendant Schamu M. Moschowitz was to conduct the manufacturing department,

and the defendant Herman Moschowitz was to conduct the selling department.

That McCall was to receive one-third of the profits, and such sums as he might advance to, or obtain for, and pay into the co-partnership business, with interest at 6 per cent.; and that the defendants were each to receive one-third of the profits.

2. That McCall, up to and including December 20th, 1881, advanced and obtained the sum of $28,401.69, for the benefit of, and which was used in, the business.

That the interest on this sum, to the date of the report, amounted to $4,785.68; making a total of $33,187.37.

That, at the commencement of the action, there was a large quantity of goods and other property belonging to, and debts owing to, the co-partnership; and that the profits could not be determined at the time of this report, because the property and effects had not been converted wholly into money.

3. That, of the sum of $28,401.69 McCall advanced and obtained $7,979.80, from J. B. & H. M. Tilford, December 1st, 1881; and McCall and the defendants, under the firm name of Moschowitz Brothers, sold and delivered to the Tilfords, accounts owing Moschowitz Brothers, in face value amounting to $8,489.14. Those accounts, Moschowitz Brothers agreed they would collect, and pay over the proceeds thereof to the Tilfords through McCall; and the firm of Moschowitz Brothers, composed of McCall and the defendants, agreed said accounts should be collected, and the proceeds paid over to the Tilfords, within three months thereafter.

That McCall, individually, guaranteed the payment of said sum within said three months.

That no part of the $8,489.14, or the interest thereon, had been paid to the Tilfords; and that the firm of Moschowitz Brothers, composed of McCall and the defendants, was indebted to the Tilfords in that amount; and that the plaintiff, as executrix of McCall, was individually indebted to the Tilfords in said sum and interest, amounting, at the

date of the report, to $1,329.96, making a total of $9,819.10, which sum the referee found should be deducted from the principal and interest specified in the first conclusion of law, to wit, said sum of $33,187.37 ; and that said sum so due the Tilfords with interest, should be paid to them, out of the co-partnership property and effects, as a debt due by said co-partnership ; and that the estate of said McCall should be discharged from said liability therefor, on his guaranty, and also as a member of said firm.

The referee also found as conclusions of law :

1. That the plaintiff recover judgment against the defendants for the sum of $33,187.37, principal and interest, of money advanced or procured and paid in, by McCall, and received by the co-partnership, and used in its business, with costs.

2. That a permanent receiver should be appointed of the property and effects of the co-partnership; including the good will and all accretions of profits arising from the continuance of the business.

That such receiver, upon the approval of his bond, should be invested with the usual powers of receivers in such cases, and that he should pay the sum advanced to the co-partnership by McCall, with interest, from the date of the report. But of that sum, $9,819.10, with interest from the date of the report, should be paid directly to the Tilfords, and the judgment ordered for the plaintiff should be reduced by that amount. And that the receiver should also pay or discharge all other debts or liabilities owing by such co-partnership, and its expenses, etc., and thereafter the plaintiff should recover judgment against the defendants for one-third of such sum as might be found, on a further hearing before the referee, to be the profits of such business, which the receiver should pay out of such moneys as might remain after the payment of the sums before mentioned ; and if any surplus should remain, to pay one-half of such surplus to each of the said defendants.

The report also contained other conclusions of law, not now necessary to state. An interlocutory judgment was

McCall *v.* Moschowitz.

entered upon this report, and in conformity with it, on the 16th day of January, 1885; from which the defendants appealed.

*A. J. Dittenhoefer*, for appellants.

*D. M. Porter*, for respondents.

BOOKSTAVER, J. — [After stating the facts as above.] — Upon the argument, the appellants contended that the interlocutory judgment should be set aside, because, the main issue being as to whether or not there was a co-partnership, the action was not referrible.

By section 1347 of the Code of Civil Procedure, an appeal from that order lay directly to the General Term. By ·section 1351, the time for such appeal is limited to thirty days; and this appeal was not taken until more than two years after such limitation had expired, and was therefore too late.

But appellants contend that it is reviewable under section 1316 of the Code, and is not affected by the expiration of the time within which a separate appeal might have been taken. Section 1316 only provides for reviewing an intermediate order, when an appeal has been taken from a final judgment. The appeal in this action is taken from an interlocutory judgment, under section 1349, and this section does not provide for the review of an intermediate order upon such appeal, although specified in the notice of appeal.

But, assuming that the question may be reviewed at this time, we think the order should not now be set aside. Section 1316 only provides for the review of an intermediate order "necessarily affecting the final judgment." We do not think that sending the case to a referee necessarily does this. The action is in equity, and the issues are not triable by a jury, but by the court. The order substitutes a referee for the court. How are we to say that a trial before the referee, instead of the court, necessarily affected

the final judgment? If it is claimed that it affected a substantial right, then the appeal should have been taken within thirty days, and under section 1347 of the Code.

It is true that ordinarily, in an action to dissolve a co-partnership, if the question of co-partnership is in issue, that issue will be first determined by the court, before a reference for an accounting will be ordered (*Cameron* v. *Freeman*, 18 How. Pr. 310 ; *Graham* v. *Golding*, 7 Id. 260) ; and the Court of Appeals have construed section 1013 of the Code, respecting compulsory references, to include only the class of cases in which the immediate object of the party is to recover the account relied upon (*Camp* v. *Ingersoll*, 86 N. Y. 433) ; and this construction has been followed in this court, in *Street* v. *Rothschild* (12 Abb. N. Cas. 383).

The court, in this case, after three days' trial, found that the trial of the action required the examination of a long account and ordered a reference accordingly, against appellants' objection. But the appellants, instead of appealing therefrom, took their chances before the referee, without making any objection to proceeding before him, and it was not until after the referee's report had been filed, and judgment entered thereon, that the appellants undertook to prosecute their appeal. As before shown, we think it is now too late. The case of *Ried* v. *Lozin* (31 Hun 286), it is true, decided that a defendant did not, by appearing before a referee, and producing and examining witnesses, waive his right to appeal from the order denying his motion to open the default; but in that case, when he first appeared before the referee, he objected to the reference as unauthorized, and renewed his objection at the close of the hearing, and immediately appealed from the order. The court there held that, after stating their objection before the referee, what they did when the objection was overruled was of a compulsory nature, and they were obliged then either to go on with the trial or take the risk of injustice being done them if they failed to do so ; and the same doctrine was laid down in *McNamara* v. *Canada S. S. Co.* (11 Daly 297). But in this case the defendants went on before the

referee, and took nearly 1800 printed pages of testimony without objecting to the referee's right to proceed; and under the circumstances of the case, we think they must be held to have waived any objection to the order of reference under *Ubsdell* v. *Root* (1 Hilt. 173); *Claflin* v. *Farmers' and Citizens' Bank* (25 N. Y. 293).

The appellants have urged forty different objections and exceptions to the referee's conduct of the trial, his report, and the interlocutory judgment entered thereon.

These may most conveniently be considered in three groups:

1. Exceptions to the admission or exclusion of evidence, and the conduct of the trial.

2. Exceptions to the conclusions of the referee in regard to the existence of a co-partnership between McCall and the defendants.

3. Objections to the interlocutory judgment, as entered.

There being about thirty exceptions to the admission and exclusion of evidence, we can but briefly state our opinion thereon, without fully setting forth the reasons therefor.

The first of these relates to the reception of a letter written by plaintiff to J. B. Tilford, in May preceding the alleged co-partnership. This letter was only admitted for a limited purpose, and it was expressly stated by the referee that it was not for the purpose of proving the co-partnership. From the testimony in the case, it is manifest that there had been previous dealings between the parties, and that McCall had been aiding the defendants financially; and the letter was only admitted to show the previous relations between the parties, and as a part of the inducement moving McCall to form the alleged co-partnership. It nowhere appears that this letter was relied on by the referee to sustain his finding as to the alleged co-partnership. We do not think it was error to admit the letter for this limited purpose; but if it was, we do not perceive how it injured the defendants. And we think the letters to Tilford, of the dates April 14th and June 16th, 1880, were properly received, for the same reasons.

Appellants also objected to various letters written by plaintiff to the defendants, after the formation of the alleged co-partnership. To their admission in evidence, the appellants took no specific objection. But if they had, we think the letters would have been admissible as tending to show the conduct of the business, and the purpose and intentions of the parties. All of the foregoing letters were written in the current business of defendants, to borrow money or procure credit; and after consultation with S. M. Moschowitz. McCall, the witness to whom the referee seems to have given the most credit, testified: " All letters which I wrote pertaining to the business were submitted to Mr. Moschowitz. If any were written at the house, they were sent to me." The defendants therefore knew of these letters, and did not object to their contents, and they were properly received in evidence.

Appellants also claim that the referee erred in admitting the declarations and conversations of the plaintiff with third persons, when neither of the defendants was present. We have examined the instances pointed out by the learned counsel for the appellants in his brief, and do not think that any such conversations or declarations so admitted could have materially affected the result arrived at by the referee. An examination of them shows that most of these conversations and declarations were reported to the defendants, and were a part of the *res gestæ*, being in the ordinary course of the transactions in relation to the business of the alleged co-partnership. Others of these conversations were admitted to show that McCall gave directions respecting the conduct of the business, and still others were admitted for the purpose of contradicting witnesses produced by the defendants, and not for the purpose of establishing the co-partnership.

The appellants also contend that the referee erred in refusing to permit them to introduce their acts and declarations in evidence, unless they occurred in the presence of the plaintiff. We have examined all the instances cited by the learned counsel for the appellants. The first of these

was in relation to a check given to a Mr. Dart, but not in the regular course of the business, and what the defendants or one of them said, at the time, as to what the check was given for, was certainly irrelevant. The next was in regard to changing the account from James McCall, attorney, to Moschowitz Brothers; and the question excluded was not about a conversation with the defendants, but in relation to the circumstances under which the change was made; and there was no offer to connect the testimony in any way with McCall. The third was relative to conversations between one of defendants' witnesses and defendants' attorney; and could, in no aspect of the case, be made evidence for or against either of the parties to this action. All the other instances will be found, on examination, to be of a similar character; and we think the referee's rulings thereon, if in some instances incorrect, did not injure the defendants.

The next alleged error which we now notice, was in refusing to allow the defendants to show that there was no entry in the books indicating that plaintiff was a partner. An examination of the proposed testimony shows that the defendants did not seek to show this by entries in the books themselves, which are competent evidence on the subject (*Frick* v. *Barber*, 68 Pa. St. 120), but sought to prove it by the opinions of two bookkeepers, after an examination of the books. We think the referee properly excluded the opinion of the bookkeepers, as the books themselves were the best evidence.

Appellants claimed that they ought to have been allowed to show, by the plaintiff, that he informed H. M. Tilford that the accounts proposed to be assigned to him were first-class accounts. We think the evidence entirely immaterial to the question at that time before the court, as it related to the accounts of Moschowitz & Russell, and not to the accounts of the alleged co-partnership.

The exception to the exclusion of the question as to whether or not S. M. Moschowitz gave any directions as to making out the checks or the entries in the books, we think untenable, because immediately prior to that, witness had

testified, " I did not, after May 1st, 1880, give any direc-
tions to Miss McEntyre, Miss Kennedy, Mr. Politzer, or
Mr. Curry, as to making any entries in the books, or how
the checks were to be made out;" but that Mr. McCall
gave the directions and instructions in those matters.   The
question was a mere repetition of what had already been
testified to.

Appellants contend that it was error in the referee to
refuse to receive in evidence the "Weekly Bazaar" and
other publications issued by McCall.   We do not see what
possible relevancy they had to the case, and think they
were properly excluded.

Appellants next claim that the referee should have
allowed them to prove statements made by a certain Mr.
Bladworth, who was sent by McCall to the defendants,
for the purpose of delivering certain notes, etc.   He was
not in any sense McCall's general agent, charged with
his general business; he was not authorized to, nor could
he make admissions which would be binding on the plaintiff
(*Highland* v. *Sherman*, 2 E. D. Smith 234).

We think there was no error in refusing to permit the
defendants to show by John Russell the uniform rate of
interest in the notes given to plaintiff, as the question, at
that time, was not in relation to the notes given under the
partnership in question, but referred to the old business
of Moschowitz & Russell.   Besides, the same evidence,
when it became material, was admitted.

The other objections taken by the appellants to the
admission or exclusion of evidence, relating to the question
of co-partnership, we have examined in detail; and while
some of them were undoubtedly well taken, we do not think
they could, by any possibility. have affected the conclusion
at which the referee arrived.   In equitable actions, excep-
tions to evidence are not regarded, if the court is of opin-
ion that no injustice has been done (*Hubbell* v. *Schreyer*,
4 Daly 382; *Mulock* v. *Mulock*, 1 Edw. Ch. 14; *Church* v.
*Kid*, 3 Hun 254; *Milliner* v. *Lucas*, Id. 496).

During the progress of the trial, the appellants served J.

B. Tilford with a subpœna *duces tecum*, requiring him to produce his books and checks relating to his transactions with the plaintiff, before the referee, which subpœna he obeyed. Appellants' counsel then asked him to exhibit these books and checks, first to himself, and afterwards to the court. This the witness declined to do, and the referee refused to compel him to do so, although appellants' counsel requested the referee to so order, and this, they claim, was error.

An examination of the case shows that when the books and papers were produced before the referee, in obedience to the subpœna, defendants' counsel in various ingenious ways endeavored to get certain entries in the books and papers in evidence, without offering the books, etc., themselves. To these efforts plaintiff invariably opposed the objection that the books, etc., were the best evidence, and although defendants had abundant opportunity to offer them in evidence, they did not do so, although no objection was made by plaintiff to their going in evidence.

The question, therefore, reduces itself to this: Has counsel the right to compel the inspection of the private writings of a witness, not a party to an action, without the declared intention of offering them in good faith in evidence? Were the question: Has counsel the right to compel a stranger to disclose to him what he knows about a case, before he offers him as a witness? — we think there could be but one answer, and that, in the negative. However desirable such information may be, the law has provided no way of compelling a stranger to make such a disclosure. We fail to see what difference it makes, whether this information has been reduced to writing, and is in the exclusive possession of a stranger, or exists in his memory only. To compel a stranger to exhibit his private writings to counsel, before they are offered in evidence, or at any rate, before such counsel has declared his intention to offer such parts as may be material to the controversy in evidence, would be fraught with great danger. Counsel might desire such an inspection for the purpose of ascertaining

facts in relation to such a witness's business, and then commencing an action against him, without any intention of offering the writings in evidence in the action in which he was subpœnaed to produce them. In this case, it may well have been for the purpose of ascertaining whether these writings could be made useful to defendants in a controversy which, as it appears from the case, they then had with the witness. We know of no rule requiring the submission of such writings to the court; except in case witness claims a privilege, as in *Mitchell's Case* (12 Abb. Pr. 249). But, in the present case, witness obeyed the subpœna, and as far as appears, claimed no privilege, but was willing they should go in evidence, if defendants desired it, which apparently they did not.

Appellants also claim that the referee erred in not allowing defendants to show the liabilities of the business carried on in 1880. This is a very strange claim to make now, when the defendants in their answer, and throughout the trial, most earnestly contended that no partnership ever existed between them and McCall; that the only relation of plaintiff's decedent to them was that of money lender; and when at the close of the whole case they asked the referee to find, "That no co-partnership of any kind was, at any time, or at any place, made or entered into by the plaintiff's testator with the defendants or either of them." Defendants chose the ground on which they would rely, and must abide the consequences. Beside, if any partnership existed between plaintiff's testator and any one in 1880, concerning which there is no finding, it existed with one of the defendants only, and not with both; and the inquiry would not be pertinent to this issue, which is as to a partnership with McCall and both defendants. If such a co-partnership existed between McCall and S. M. Moschowitz, and there was a loss, there is nothing to prevent him from commencing an action against the plaintiff, as executrix, to recover what may be due him under that co-partnership.

The referee has found that McCall was to take charge of and conduct the financial affairs of the alleged co-partner-

ship, and procure money so far as it might be required and he was able to do, to carry on the business, and that he advanced and paid in something over $28,000, before the. expiration of the co-partnership. That, of this sum, he procured $7,979.80 from J. B. and H. M. Tilford, for which Moschowitz Brothers sold and delivered accounts belonging to them, amounting to $8,489.14, and which they agreed to collect and pay over to the Tilfords through McCall; and that no part of said sum had been collected, and that McCall was liable to the Tilfords for this amount, as guarantor; and in the interlocutory judgment, he orders this sum and interest to be paid to the Tilfords.

On the trial, defendants endeavored to show that, for a part of this amount, J. B. Tilford had commenced an action against the defendants personally, but the referee excluded the evidence. They also endeavored to show from Tilford's own books, payments made by defendants to him, which was also excluded. The referee also refused defendants permission to ask J. B. Tilford on cross-examination, whether any of the accounts assigned to him had been paid by the parties owing them, or to show by Tilford the character of his transactions with the business, but the referee disallowed the questions. In these respects we think he erred; for if the Tilfords had commenced an action against the defendants for any part of the amount the referee awarded them, and had made them principal debtors, or had done anything to relieve plaintiff's testator, plaintiff's recovery should have been reduced by the amount for which she was not liable. So also if payments had been made on account of the loan by the Tilfords, or if anything had been paid on account of the assigned bills, such payments should have been deducted from the amount awarded plaintiff, on account of her liability to the Tilfords. Again, if the transactions with the Tilfords were tainted with usury, as claimed by the defendants, and by reason of such usury, the plaintiff was not responsible to the Tilfords for the loan, or any part of it, the defendants should have been allowed to show it in reduction of the amount due plaintiff

for sums advanced by her testator, and for which he was liable as guarantor or surety. We think that defendants should have had the amplest opportunity to prove any defense they or McCall had to the Tilford loan, or any part of it. But in our view of this case, these errors can be corrected in the reference hereafter to · be had in this action.

The last of the exceptions to the exclusion of evidence which it is necessary to notice, are those in which the referee refused to allow expert witnesses to testify as to whether or not certain exhibits already in evidence, being statements of discounts received by the plaintiffs' testator, contained certain particular discounts. These exhibits spoke for themselves; they were the best evidence, and we do not think the referee erred in excluding secondary evidence of the same fact.

We now come to the consideration of the question whether or not the referee erred in finding that a co-partnership was established by the evidence.

This appeal being from an interlocutory judgment entered on the report of a referee, and the case containing all the evidence taken, is to be reviewed and the evidence examined as though originally presented to this court (*Robertson* v. *Stillings*, 8 Daly 153; *Mandeville* v. *Marvin*, 30 Hun 282); and this we have endeavored to do, with the aid of the very elaborate briefs presented by both sides.

The complaint avers, and the answer denies, the copartnership, and this throws the burden of proof on the plaintiff (*Gatewood* v. *Bolton*, 48 Mo. 78). We have endeavored to keep this in view and give it due weight.

The testimony is very voluminous and exceedingly contradictory, with no certain clue to lead through the labyrinth. From the evidence, it appears that in 1868 Schamu M. Moschowitz, one of the defendants, established the business of dressmaking in this city, which, at first, was carried on by him with one Elizabeth Russell, under the firm name of Moschowitz & Russell. Miss Russell died in February, 1880, after which the defendant Schamu M.

Moschowitz continued the business for a while, as surviving partner.

As early as 1874 plaintiff's testator commenced loaning money to the business, as is claimed by the defendants, at a usurious rate of interest, being as high as 24 and 30 per cent. per annum. He was at that time, and during this controversy, engaged in the pattern business, on Union Square, under the firm name of James McCall & Co.

After the death of Miss Russell, the testimony clearly shows that Schamu M. Moschowitz was in financial difficulties, and that the business was not profitable. Counsel for the appellants, in his brief, claims that during the year 1880 the business lost about $35,000. The evidence on this point is very contradictory, and fails to satisfy us that the losses amounted to anything near that sum; although we think it fairly deducible from the evidence, that very little, if any, profit was made during that year.

The defendant Schamu M. Moschowitz, being in need of money, applied to plaintiff's testator for assistance. The exact date does not appear, but it was after the death of Miss Russell. According to the testimony of plaintiff's testator, Mr. Moschowitz brought a statement of the accounts to him, and he and Moschowitz looked it over together, and found that the latter was indebted more than he expected; that Moschowitz said that if McCall would go on with him for a year, " he would be very much pleased for him to do so; " and that it was agreed between them that McCall was to furnish the money, and Moschowitz would attend to the labor, and McCall would attend to the financial matters; and that the arrangement was that McCall was to have no interest in the business for that year, but only in the profits. If there were no profit, he was to have nothing. Under this arrangement, Mr. McCall and Mr. Schamu M. Moschowitz continued until the first of January, 1881.

The same witness testified: " About the middle of December, 1880, Mr. Schamu M. Moschowitz was talking about the business. I told him that I wished to leave the

business on the first of January, and that nothing would induce me to remain any longer with it — that I could not remain with it.    I told him that I would instruct the bookkeepers to make out a general statement of the affairs of the business, and my book account for a general statement." The instructions were given to the bookkeeper. Mr. S. M. Moschowitz was present.  " Mr. Moschowitz said that the business could not go on if I would leave; that they were heavily in debt; and wished me to continue another year."    He then testified that there were several conversations from that time up to the first of January, and continued : " I said to Mr. Moschowitz that I would continue in business with him another year, as I saw that the business could not go on thus ; I do not know that these are the exact words; but that is the substance.   I saw from looking over the books, that he could not go on ; and he said they could not go on unless I would continue with him; I told him I would continue with him on certain conditions; the first, that Mr. Herman Moschowitz must come into the business on the first of January, and that I would continue with them for one year longer. . . .   Mr. Herman Moschowitz was sent for, and we had a conversation there together — the three of us — before the first of January. . . . On the third of January, the bookkeeper and the cashier gave me a statement.   I took it to Mr. Moschowitz, in the front room, where Mr. Moschowitz was. . . . I read off the statement to them, which was given to me by the bookkeeper, both in regard to my private account in the ledger, and a general statement of the business. . . . I then stated to Mr. S. M. Moschowitz, that if we were to go on for another year, and all work together, and did our best, I thought we could make some money the next year, if Mr. Herman Moschowitz came into the business."

According to his testimony the co-partnership was then formed between himself and the defendants; and it was agreed that " Mr. Schamu Moschowitz was to take the entire charge and management of the working department; that Mr. Herman Moschowitz was to take the entire charge

McCall *v.* Moschowitz.

and management of the floor department — selling department; and that I was to take the entire charge and management of the financial department;" and that each was to have one-third interest.

Both of the defendants denied this, and deny the conversation *in toto*. And, in opposition to this view, defendants' counsel claims that the books show that the plaintiff, after the date of this alleged co-partnership, as before, was only a creditor of the firm. To this, it is answered that the formation of the co-partnership was purposely kept secret, because they all wished the defendants to acquire credit for themselves; so that, to the employes of the house, the notes issued by it would appear to be business notes, and not made to sell; and that, to those dealing with the concern, the paper would appear to be double name paper. It is true that, if this were the object in keeping it secret, those who purchased or discounted the notes of the firm were deceived; but this, if true, operates as much to the discredit of the defendants as to McCall.

Defendants' counsel also urges against plaintiff's theory, that the defendants drew money from the business as partners, for their personal expenses, and otherwise, while the plaintiff did not. The answer to this is, that plaintiff had his own business, and did not need to draw out money for his personal expenses.

Defendants' counsel also claims that no inventory of the business was taken at the commencement of the alleged co-partnership. This, if well founded, would be a very serious consideration. But, as before shown, McCall testified that a general statement of the business was made up and read at the time the agreement was made, about the first of January, 1881; and it also appears from the evidence, that a complete inventory of the business had been made about the time the first arrangement was entered into, between McCall and Schamu M. Moschowitz.

From the testimony, it does not appear that McCall demanded an accounting, or a share in the profits until after the termination of the co-partnership; and defendants' coun-

sel claims that this strongly indicates that there was no co-partnership. We fail to see the force of this reasoning. By the terms of the co-partnership, the profits could not be ascertained until the termination of the year; and within a reasonable time after the termination of the co-partnership, he did make a demand for his interest in the business, together with his profits, as appears by his letter of February 10th, 1882.

Defendants also claim that the manner in which the assignments of debts due to the business were made, would indicate that no partnership existed, because, in such assignments, it is stated that the accounts were " sold, assigned, and delivered to James McCall, and the above accounts were lawfully due as represented, and against which there are no offsets." But the reason for this can be readily understood, if it is true, as claimed by the plaintiff, that the co-partnership was to be kept a secret. And the same reasons would account for the use of the old books of Moschowitz & Russell.

Defendants also claim that plaintiff's testator was in the habit of receiving commissions and bonuses, which were added to the bills that were paid by the defendants, and that no allowance therefor was made by the plaintiff to the defendants. This, if a fact, would simply prove the bad faith of the plaintiff, and not that he was a money lender merely. But plaintiff strenuously denies that he did not account for these commissions and bonuses, and insists that he made allowance to the defendants for them.

Defendants' counsel also urges that all notes issued by the firm were signed by one of the defendants, and not by plaintiff's testator. If the object of keeping the co-partnership a secret was to build up defendants' credit, etc., as claimed by plaintiff, this is readily accounted for on that ground.

We do not see the force of the defendants' objection that plaintiff's testator voluntarily reduced his interest in the profits from one-half to one-third, when Herman Moschowitz was admitted into the firm. The reason therefor appears

in the testimony of McCall. If the fact was that McCall's interest in the co-partnership was to be kept secret, and was kept secret, from the creditors, there is no force in the objection that no notice of the dissolution of the co-partnership was served on them. None was necessary. They had relied on him as a guarantor, and not as a partner; and after the dissolution of the partnership, he gave notice to the creditors that he would no longer be guarantor for the firm.

On the other hand, it appears from the evidence, that Mr. McCall actually furnished and procured the money necessary, from time to time, to carry on the business; that he practically attended to all the financial affairs of the business (visiting the place almost daily); that the bank accounts of the firm were kept in his name, or in his name as attorney; and that all checks for payments made by the firm were signed by him; that he wrote to the creditors of the firm, long before there was any disagreement between him and the defendants, stating the fact of his being a member of the firm, and his liability for the debts of the firm; that in his letters he wrote only as a partner would write; that he was constantly consulted by defendants about the business of the firm; that salaries were not increased upon his objection; that he engaged various employes, among them Miss Kelly, Miss Dunn, Miss Kennedy, and Miss McEntyre, the latter of whom corroborates McCall as to her engagement, and testifies that he introduced her to Mr. Moschowitz as the young lady who would take charge of the books, and that he instructed her, in the defendants' presence, to examine the accounts, etc. He also discharged the employes, among them Mr. Curry, the bookkeeper, and Mr. Politzer, also a bookkeeper, the latter of whom he afterwards re-engaged at a smaller salary. Not only did he engage and discharge the employes from the business, but advanced and reduced the wages of other employes. He gave instructions to the bookkeepers concerning the manner of keeping the books, and in matters of importance the defendants told the bookkeepers to con-

sult Mr. McCall about them. And in this McCall is corroborated by Miss McEntyre. He likewise gave instructions from what houses goods should be purchased, and in what quantities; and when he directed the employes not to purchase goods from certain houses, they were not bought there. He also directed Herman Moschowitz of whom and in what amount he should purchase goods in Paris. All the letters written in the business, which were not dictated by McCall, were submitted to him, as testified to by Miss McEntyre. Henry M. Tilford testified that McCall told him he was a partner of Moschowitz, and had an interest in the business; and that he would not have bought certain accounts from Moschowitz Brothers, if McCall had not been in the business. And Mr. Tilford corroborates McCall in regard to an interview between them, in the presence of Schamu M. Moschowitz, in which McCall told Tilford that he and the defendants had made arrangements together in business.

It is true that most of this testimony was stoutly denied by the defendants, and that McCall, at times, seemed to contradict himself in his testimony; but we think, on a careful examination of the case, that these apparent contradictions may be reconciled by bearing in mind the difference in the relations between the parties before and after the first of January, 1881; and that, before that time, he had an interest in the profits of the business only.

From this condensed recital of the evidence, and the objections urged by the defendants to the co-partnership, it will appear that the finding of fact by the referee, in regard to the existence of the co-partnership, is abundantly supported by evidence; and while, if he had found the other way, we would not have disturbed the findings, yet there is not that preponderance of evidence in favor of the defendants which would warrant us in setting his findings aside.

As was well said by J. F. DALY, J., in *Quincey* v. *Young* (5 Daly 327), " If the referee chose to credit Heath's positive statement in preference to the positive statement of all the others, together, this court would not disturb his find-

ing sooner than the finding of a jury. The familiar observations as to the better opportunities of the tribunal which found the facts to judge of the credibility of the witnesses, and of the want of such opportunities in the appellate court, need not be repeated here. We have no right to conclude that, because the story of one witness appears on paper to be more succinct, straightforward, and fluent than another, it embodies the truth of the matters in dispute, as opposed to the statement of another witness, which is marked by inaccuracies, or even inconsistencies. No tribunal will or can arrive at the truth from such statements, except the one which hears and sees the witnesses."

We think, therefore, that the referee's findings of fact, in regard to the co-partnership, should be sustained.

Having arrived at this conclusion, it remains to examine the objections to the interlocutory judgment, as entered.

It is a fundamental rule of law, needing the citation of no authorities, that co-partnership assets must be first applied to the payment of co-partnership debts. We think it is equally well settled, that in actions of this kind, it is first necessary to ascertain whether or not a co-partnership existed; and if it is found that it did exist, the next thing to be determined is, how the firm stands as to its general creditors, and whether or not there are sufficient firm assets to pay them; after this is ascertained, then to determine what each partner is entitled to charge against the other for everything he has advanced or brought in the co-partnership, and also to charge against him whatever he has taken out, in excess of what he ought; and lastly, to apportion between them the profits to be divided or losses to be made good; and ascertain what, if anything, any partner should pay to another in order that all cross-claims may be settled (*Neudecker* v. *Kohlberg*, 3 Daly 410; *West* v. *Skip*, 1 Ves. Sr. 242).

Indeed, plaintiff's testator and his counsel seem to have had this rule in mind when the complaint was framed, for, in his prayer for relief, he asks that a receiver be appointed with power " to collect all debts for the benefit of all parties

entitled thereto, and that the proceeds thereof be divided, after payment of all just debts of said co-partnership," etc.

In this case, the referee, after determining that a co-partnership existed, and before ascertaining the liabilities of the concern, and whether it was solvent or not, and without an inquiry into the advances made by the defendants, the stock or capital contributed by them, or the sums to which they may be entitled, or claims they may have against plaintiff's testator, has determined the amount of the loans and advances made by him or for which he was liable; and in this amount, has included a sum ·claimed to be due the Tilfords, but to which there may be an entire or partial defense, as we have before pointed out; and has directed judgment absolute for that amount, and directed the appointment of a permanent receiver to take possession and convert the property, assets, and effects of the co-partnership into money; and that he, as such receiver, pay and discharge the sums so advanced, obtained, and paid into said co-partnership by McCall, with interest, etc., less the sum he directed to be paid to the Tilfords; and this without first making provision for the payment of. the general creditors of the firm, and before ascertaining who they were, and what amounts were due them, and before ascertaining the value of the assets of the firm. The interlocutory judgment was entered in conformity with the report.

We think the referee erred in making these directions without first making the inquiries above pointed out as necessary to be done in actions of this kind, and that the interlocutory judgment, except in so far as it adjudges that a co-partnership existed between plaintiff's testator and the defendants, is erroneously entered.

The report should be sent back to the referee to inquire and determine:

1. Who the general creditors of the co-partnership are, and the just amount of their several claims, exclusive of the claims of the Tilfords, and the plaintiff.

2. The just and true amount of the claims of the Til-

fords, and whether these claims should be included among those of the general creditors of the firm, or whether they are claims against the plaintiff's testator, as surety or guarantor; and in determining these claims he should allow the defendants to prove any defense there may be to such claims, either in law or in equity, and this, whether such defense exists in favor of the defendants or the plaintiff.

3. To ascertain and determine the just and true amount of the loans and advances made by McCall to the co-partnership in his lifetime, including all sums for which he was liable as guarantor or surety. In doing this, he may assume, as already proved in the case, that this amount is $20,421.89 exclusive of the Tilford claims. To this, he will add the amount he may find due the Tilfords in case he finds their claims are against the plaintiff, and not against the co-partnership; otherwise he will add the amount of the Tilford claims, if any, to that of the general creditors to be first paid out of the co-partnership effects. The defendants, however, must be allowed to reduce the aforesaid amount of $20,421.89 by any sum or sums they may be able to show has been paid or otherwise wrongly or erroneously included in said amount; and also by any charges and offsets they may have against it, in law or in equity, or for bonuses, commissions, or otherwise.

4. To ascertain and determine what stock or capital was contributed by defendants to the partnership formed on the first of January, 1881, or any claim they may have against the plaintiff, arising out of said co-partnership.

5. To ascertain and determine the value of the stock, fixtures, and assets of the co-partnership on the first day of January, 1882, and any profits that may have accrued by reason of their use by defendants, and also the profits or the losses made by the co-partnership during the year 1881, and apportion these between plaintiff and defendants in the proportion of one-third to plaintiff and two-thirds to defendants.

As the temporary receiver is now acting under the order of this court and depositing all moneys collected by him in

it, we do not see why he should not be continued in such temporary receivership for the present.

To the end that the referee may determine the value of the stock, fixtures, and assets of the co-partnership, and the profits or losses of the same, as above provided for, the amended interlocutory judgment to be entered on this opinion should provide for the immediate sale, by the receiver, at public auction, on due public notice, of all the stock, fixtures, and assets now on hand belonging to the co-partnership of 1881, and that he should account to said referee for the value of the stock, fixtures, and assets of said co-partnership (other than the good will of the business) used by the defendants; together with any profits that may have been realized by defendants, by reason of such use, deducting therefrom all reasonable charges and expenses incurred by defendants, in using such stock, etc.

We have intimated above that the referee should not include the good will of the business in his accounting. We think that this good will depends so largely on the skill of the defendant, Schamu M. Moschowitz, that it is no more the property of the co-partnership, or the subject of sale, than would be the good will of an attorney's business, or that of an artist. In addition to this, plaintiff's testator testified that he only went into the business for a year, in order to establish the defendants' credit, etc., and was to leave, and did leave, at the end of the year. In *Van Dyke* v. *Jackson* (1 E. D. Smith, at p. 421), Judge WOODRUFF says: " 1st. If it (the good will) was attached to the *place*, he was by the agreement bound to leave it, and the defendants were not bound to pay him for doing so. 2d. If it was not thus attached to the place of business, if it could be detached and used separate therefrom (which, to me, at least, is a novel suggestion), the defendants have no more taken possession of it than the plaintiff."

If, on the accounting, the referee should find there were assets of said co-partnership sufficient to pay the general creditors in full, including the Tilfords, — if he find they

were general creditors, — then he should direct such payment to be made by the receiver, at once.

If he should find there were sufficient assets, in addition thereto, to pay plaintiff the loans and advances made by her testator, including any sums on which he was liable as surety or guarantor, in full, then he should direct such payment to be made, including interest thereon, from the 20th of December, 1881.

If there were not sufficient assets to pay in full, then to pay the same as far as the assets would go.

If, after making these payments, anything should be left, he should direct that payment be then made defendants for anything that may be found due them for anything else than profits; and lastly, if he should find there were any profits, he should direct the payment of one-third of these to the plaintiff.

The interlocutory judgment should be amended to conform to this opinion. Order to be settled by one of the judges of the General Term, on two days' notice.

No costs of this appeal to either party as against the other.

LARREMORE, Ch. J., and ALLEN, J., concurred.

Order accordingly.